IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF ALABAMA
SOUTHERN DIVISION

REGINA BROWN o/b/o          )
JOSEPH BROWN,               )
                            )
     Plaintiff,             )
                            )
vs.                         )CIVIL ACTION NO. 04-00447-WS-B
                            )
JO ANNE B. BARNHART,        )
Commissioner of             )
Social Security,            )
                            )
     Defendant.             )

## REPORT AND RECOMMENDATION

Plaintiff Regina Brown brings this action on behalf of her son Joseph Brown seeking judicial review of a final decision of the Commissioner of Social Security denying his claim for supplemental security income benefits under Title XVI of the Social Security Act ("Act"), 42 U.S.C. §§ 1381-1383c.  This action was referred to the undersigned for report and recommendation pursuant to 28 U.S.C. § 636(b)(1)(B).  Oral argument was held on June 20, 2005.  Upon careful consideration of the administrative record, oral argument and the memoranda of the parties, it is recommended that the decision of the Commissioner be **AFFIRMED.**

## I.   Procedural History

On October 31, 2001, Plaintiff Regina Brown (hereinafter "Plaintiff") protectively filed an application for supplemental security income benefits on behalf of her son Joseph Brown

("Joseph"), alleging that he had been disabled since November 1, 1995 due to borderline intellectual functioning, asthma, attention deficit disorder, depression, anxiety, panic disorder, and swelling of extremities. (Tr. 62-64). On May 16, 2002, Plaintiff's application was initially denied, and a Request for Hearing was filed on June 5, 2002.[1] (Id. at 65-69). On December 3, 2002, Administrative Law Judge James D. Smith ("ALJ Smith") conducted a hearing which was attended by Plaintiff, who appeared and testified on behalf of her son Joseph, and Plaintiff's attorney. (Id. at 40-61). Also in attendance at the hearing was Peter S. Bertucci, M.D., (hereinafter "Dr. Bertucci"), a pediatrician at the Mobile Mental Health Center, (hereinafter "MMHC"). (Id.)

On February 28, 2003, ALJ Smith entered an unfavorable decision wherein he found that Brown has the severe impairments of asthma, juvenile rheumatoid arthritis, status post fracture of the left tibia and fibula, adolescent obesity, gatroesophageal reflux disease (hereinafter "GERD"), generalized anxiety disorder, major depression, attention deficit hyperactivity disorder (hereinafter "ADHD"), learning disorder

---

[1]Plaintiff's application was denied at the initial level and was a treated as a prototype case; thus, the reconsideration step was eliminated. 20 C.F.R. §§ 404.906, 404.966, 416.1406 and 416.1466. (Tr. 62-64).

NOA v. borderline intellectual functioning, and panic disorder with agoraphobia, and that his impairments, when considered individually, or in combination, do not meet or medically equal a Listing, or functionally equal in severity an impairment set forth in the Listing of Impairments, 20 C.F.R. 404, Subpart P, Appendix. 1, Regulations No. 4. (_Id_. at 20-37). On June 22, 2004, Plaintiff's request for review was denied by the Appeals Council making the ALJ's decision the final decision of the Commissioner of Social Security. (_Id_. at 6-8, 14-19). The parties agree that this case is now ripe for review and is properly before this Court pursuant to 42 U.S.C. §§ 405(g) and 1383(c)(3).

## II. **Background Facts**

Joseph was born on December 4, 1989 and was twelve years old at the time of the December 3, 2002[2] administrative hearing. (Tr. 36, 46). At the hearing, Plaintiff, who testified on her son's behalf, stated that Joseph was 5'3" and weighed 193 pounds, having gained over forty pounds in a one year time frame.[3] (_Id_. at 51). Plaintiff also testified that Joseph had

---

[2]Joseph turned thirteen the day following the hearing. (Tr. 46).

[3]Plaintiff testified that the doctors did not know what caused Joseph's weight gain and that the doctors were planning to check his medications, and check to see if the weigh gain was due to "stress eating." (_Id_. at 51).

to repeat the first grade in school, and although he had been promoted to the sixth grade, he was not currently in school due to anxiety and panic attacks. (Id. at 48). According to Plaintiff, during the most recent school term, Joseph had only attended three days of school. (Id. at 48, 52-53). She explained that Joseph's problems at school had included extreme crying, diarrhea, vomiting and a refusal to leave the car and that the counselor indicated that there was nothing the school could do to assist at that point, and suggested that because Joseph's behavior would be disruptive, he should be kept at home until his anxiety and panic attacks were under control. (Id. at 53). As a result, the school allowed Joseph to withdraw for the semester. (Id.) Plaintiff testified that she discussed Joseph's problems with Dr. Dillon, at Mobile Mental Health Center, and that they tried different medication therapy which finally seemed to help Joseph's anxiety and panic attacks. (Tr. 53). She expressed hope that Joseph would be able to return to school when the new semester began in January, 2003. (Id. at 53-54).

Plaintiff testified that as long as Joseph is on his medication, he does not have any problems, except when encountering a situation or person with whom he is not familiar. (Id. at 54). Plaintiff also testified that Joseph interacts

4

with his brother and sister, and plays with the neighbor's child. (Id.) She also indicated that despite her efforts, she has been unable to interest Joseph in any team or group sports. (Id.) Plaintiff described Joseph's daily activities as sleeping, laying around and eating. (Id.)

Plaintiff also testified that Joseph has orthopedic and eye problems. (Tr. 49-50, 52). According to Plaintiff, Joseph's arthritis medication "play[s] with [his] vision[,]" and causes him to have stomach pain. (Id. at 52, 55). Plaintiff also testified that Joseph has trouble with his feet, knees and hips every day. (Id. at 50-51). He experiences swelling in his lower extremities, limps and tells her that he is in pain. (Id.) Plaintiff indicated that "[b]efore the end of the day he almost has pitted edema in his feet[]" and that "usually indicates . . . the inflamation is back in a certain joint or area[]" due to his juvenile rheumatoid arthritis. (Id.) Plaintiff also testified that Thomas R. Dempsey, M.D., (hereinafter "Dr. Dempsey"), of Children's Rehabilitation Services, has indicated that Joseph needs new X-rays due to "swelling in his left knee growth palate[]" and because "they're going to have to go in and find out why [he fractured his foot]." (Id. at 52).

In addition to Plaintiff, pediatrician Dr. Bertucci also

testified at the administrative hearing. (Tr. 56-61, 79-80). Dr. Bertucci testified that based upon his review of the medical records, he opined that Joseph's edema was pretty well controlled, and noted that Dr. Dempsey had recently found that there was no occlusion or swelling of his knee. (Id. at 58-60). Additionally, Dr. Bertucci testified that if Plaintiff's testimony regarding Joseph's anxiety was accepted as true, Joseph would have marked limitations in the social and personal domains. (Id. at 60-61).

The ALJ determined that Joseph has not engaged in substantial gainful activity. (Id. at 36, Finding 2). The ALJ further determined that Joseph has the severe impairments of asthma, juvenile rheumatoid arthritis, status post fracture of the left tibia and fibula, adolescent obesity, GERD, generalized anxiety disorder, major depression, ADHD, learning disorder NOS v. borderline intellectual functioning, and panic disorder with agoraphobia. (Id., Finding 3). Next, the ALJ concluded that Joseph does not have an impairment or combination of impairments which meet or medically equal the criteria for any of the impairments listed in 20 C.F.R. Pt. 404, App. 1, Subpt. P. (Id., Finding 4). The ALJ also found that Joseph does not have severely disabling limitations in specific functions caused by a medically determinable physical or mental impairment, or

disabling limitations resulting from chronic illnesses, the nature of the treatment required or the effects of medication. (Tr. 36, Findings 5-7).  The ALJ found further, that Joseph has less than marked limitations in all of the six domains for functional equivalency.  (Id. at 36-37, Finding 8).  The ALJ then found that Plaintiff's assertions, relative to Joseph's symptomatology, functional limitations and restrictions of activities of daily living, lack corroboration or substantiation in the medical evidence and are not credible as to a disabling impairment.  (Id. at 37, Finding 9).  The ALJ accordingly found that Joseph is not disabled.  (Id., Finding 10).

**III.  <u>Issue On Appeal</u>**

Whether the ALJ erred by failing to grant controlling weight to Plaintiff's testimony?

**IV.  <u>Analysis</u>**

**A.  <u>Standard Of Review</u>**

In reviewing claims brought under the Act, this Court's role is limited to determining whether the final decision is supported by substantial evidence and free of legal error.[4]  42 U.S.C. § 405(g).  <u>See</u>, <u>e.g.</u>, <u>Wilson v. Barnhart</u>, 284 F.3d 1219, 1221 (11th Cir. 2002); <u>Lewis v. Callahan</u>, 125 F.3d 1436, 1439-1440 (11th Cir.

---

[4]This Court's review of the Commissioner's application of legal principles is plenary.  <u>Crawford & Co. v. Apfel</u>, 235 F.3d 1298, 1302 (11th Cir. 2000).  <u>See also</u> <u>Miles v. Chater</u>, 84 F.3d 1397, 1400 (11th Cir. 1996).

1997); <u>Foote v. Chater</u>, 67 F.3d 1553, 1558 (11th Cir. 1995); <u>Martin v. Sullivan</u>, 894 F.2d 1520, 1529 (11th Cir. 1990); <u>Walker v. Bowen</u>, 826 F.2d 996, 999 (11th Cir. 1987); <u>Bloodsworth v. Heckler</u>, 703 F.2d 1233, 1239 (11th Cir. 1983). This Court may not decide the facts anew, reweigh the evidence, or substitute its judgment for that of the Commissioner. <u>Sewell v. Bowen</u>, 792 F.2d 1065, 1067 (11th Cir. 1986); <u>Bloodsworth</u>, 703 F.2d at 1239. The Commissioner's findings of fact must be affirmed if they are based upon substantial evidence. <u>Brown v. Sullivan</u>, 921 F.2d 1233, 1235 (11th Cir. 1991); <u>Bloodsworth</u>, 703 F.2d at 1239 (concluding that substantial evidence is defined as "more than a scintilla but less than a preponderance[]" and consists of "such relevant evidence as a reasonable person would accept as adequate to support a conclusion[]"). <u>See also</u> <u>Richardson v. Perales</u>, 402 U.S. 389, 401 (1971). In determining whether substantial evidence exists, this Court must view the record as a whole, taking into account evidence favorable as well as unfavorable to the Commissioner's decision.[5] <u>Chester v. Bowen</u>, 792 F.2d 129, 131 (11th Cir. 1986); and <u>Short v. Apfel</u>, 1999 U.S. DIST. LEXIS 10163 (S.D. Ala. 1999).

---

[5]<u>See</u> <u>also</u> <u>Robinson v. Massanari</u>, 176 F. Supp. 2d 1278, 1280 (S.D. Ala. 2001).

B.  **Childhood Disability Law**

The Personal Responsibility and Work Opportunity Act of 1996, which amended the statutory standard for children seeking supplemental security income benefits based on disability, became effective on August 22, 1996.  See Pub. L. No. 104-193, 110 Stat. 2105 § 211(b)(2) (1996) (codified at 42 U.S.C. § 1382c).  The definition of "disabled" for children under 18 is:

> An individual under the age of 18 shall be considered disabled for the purposes of this subchapter if that individual has a medically determinable physical or mental impairment, which results in marked and severe functional limitations, and which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months.

See 42 U.S.C. § 1382c(a)(3)(C)(i); and 20 C.F.R. § 416.906.[6] The Social Security Regulations provide a three-step sequential evaluation process for determining childhood disability claims. 20 C.F.R. § 416.924(a).

At step one, a child's age and work activity, if any, are identified to determine if the child has engaged in substantial gainful activity.  At step two, the child's physical and mental impairments are examined to see if the child has an impairment or combination of impairments that are severe.   Under the

---

[6]On September 11, 2000, the Commissioner published Final Rules for determining disability for a child under the age of eighteen. See 65 Fed. Reg. 54,747, corrected by 65 Fed. Reg. 80,307.  These rules became effective on January 2, 2001 and thus apply to Plaintiff's claim.  See 65 Fed. Reg. at 54,751.

9

regulations, a severe impairment is one that is more than "a slight abnormality or a combination of slight abnormalities that causes no more than minimal functional limitations." 20 C.F.R. § 416.924(c).  To the extent the child is determined to have a severe impairment, at step three, the child must establish that the impairment results in marked and severe functional limitations. 42 U.S.C. § 1382c(a)(3)(C)(i).  The regulations set forth that an "impairment(s) causes marked and severe functional limitations if it meets, medically equals or functionally equals the listings." 20 C.F.R. § 416.924(d).  A child's impairment(s) meets the Listings' limitations if the child actually suffers from limitations specified in the Listings for that child's severe impairment. 20 C.F.R. § 416.926(d).  A child's impairment medically equals the Listings if the child's limitations are at least of equal severity and duration to the listed impairment(s). Id.  Where, as in this case, a child's impairment or combination of impairments does not meet or medically equal any Listing, then the Commissioner must determine whether the impairment or combination of impairments results in limitations which functionally equal the criteria for a Listing.[7]  Id.

---

[7]In making this assessment, the reports of the State Agency medical consultants, the reports or other treating, examining and non-examining medical sources and, the claimant's symptoms, including pain and the extent to which these symptoms can reasonably be accepted as consistent with the objective medical evidence and other evidence, are all taken into consideration.  20 C.F.R. §§ 416.927 and

To determine whether a child's impairment functionally equals a listing, the regulations require consideration of six domains:[8] 1) acquiring/using information; 2) attending/completing tasks; 3) interacting/relating with others; 4) moving about/manipulating objects; 5) caring for oneself; and 6) health/physical well-being. 20 C.F.R. § 416.926a(b)(1)(i)-(vi). To satisfy the functionally equivalent standard, a child must have either a marked limitation in two domains of functioning, or an extreme limitation in one domain. 20 C.F.R. § 416.926a(a).[9] A marked limitation in a domain is defined as a limitation that "interferes seriously with his [the child's] ability to independently initiate, sustain or complete activities."[10] 20

_____

416.929; and SSR 96-5, 96-6p and 96-7p.

[8]The degree of limitation in the relevant domains is then assessed within four ranges: 1) no evidence of a marked limitation; 2) less than marked limitation; 3) marked limitation; and 4) extreme limitation. 20 C.F.R. § 416.926a(b)(1).

[9]The regulation sets forth the methods for using each domain to evaluate functional equivalence to a Listing. 20 C.F.R. § 416.926a(f).

[10]Marked limitation also means a limitation that is: "'more than moderate but 'less than extreme.'" 20 C.F.R. § 416.926a(e)(2)(i). "It is the equivalent of the functioning we would expect to find on standardized testing with scores that are at least two, but less than three, standard deviations below the mean." Id. A marked limitation may arise when several activities or functions are limited or when one is limited. Id. A child has a marked limitation when he has a valid score two standard deviations or more below the mean, but less than three standard deviations, on a comprehensive standardized test designed to measure ability or functioning in that domain, and the child's day-to-day functioning in domain related activities is consistent with the score. 20 C.F.R. § 416.926a(e)(2)(iii).

11

C.F.R. § 416.926a(e)(2)(i).  An extreme limitation is defined as a limitation that "interferes very seriously with [the child's] ability to independently initiate, sustain or complete activities."[11]  20 C.F.R. § 416.926a(e)(3)(i).

In conducting this analysis, the ALJ may take a wide range of evidence into account when making a determination about a child's impairments, including an individual's statements about symptoms, along with information provided by treating or examining physicians, and all other relevant evidence in the record.  20 C.F.R. §§ 416.912, 416.913(d) and 416.924a; SSR 96-7p.  See also Shinn v. Commissioner of Social Security, 391 F.3d 1276, 1283-1284 (11th Cir. 2004).

**C.  Discussion**

**1.  Credibility Determination**

In the case sub judice, Plaintiff argues that given Dr. Bertucci's testimony, the ALJ should have granted her testimony controlling weight and should have concluded that Joseph has marked limitations in the domains of interacting/relating with others and caring for oneself.  (Doc. 11).  In support of her argument, Plaintiff relies upon a narrow portion of Dr. Bertucci's hearing testimony, her own hearing testimony, an April 26, 2002

---

[11]Extreme limitation also means a limitation "more than marked" and may arise when several activities or functions are limited or when one is limited. 20 C.F.R. § 416.926a(e)(3)(i).

Teacher's Questionnaire and an October 8, 2002 ADHD Questionnaire.
(Id.)  Based upon a careful review of the record, the undersigned
finds that the ALJ did not err in concluding that Joseph does not
have marked limitations in the domains of interacting/relating
with others and caring for oneself.  Rather, the record contains
substantial evidence which supports the ALJ's findings and reveals
that he carefully considered the evidentiary record as a whole,
including the hearing testimony, and made appropriate credibility
determinations in finding that Joseph is not disabled.

     At the outset, it should be noted that Dr. Bertucci never
opined that Joseph has marked limitations.  Instead, Dr. Bertucci
testified that if the ALJ determined that Plaintiff's testimony
was credible, then her testimony would support a finding that
Joseph has marked limitations in the domains of
interacting/relating with others and caring for oneself.  (Tr. 58-
61).  A review of the ALJ's decision reflects that he carefully
considered Plaintiff's testimony, and provided adequate reasons
for discrediting some of the testimony.  (Id. at 24-37).

     The law is clear that the ALJ was not obligated to
automatically assign controlling weight to Plaintiff's subjective
testimony; rather, as the finder of fact, an ALJ weighs such
testimony and decides whether or not to credit same.  See, e.g.,
Brown, 921 F.2d at 1236.  Only when a claimant establishes a

medically determinable impairment, which can reasonably be
expected to produce the symptoms alleged, is the ALJ required to
consider his or her subjective complaints along with all the other
evidence.  Hogard v. Sullivan, 733 F. Supp. 1465, 1469 (M.D. Fla.
1990).  Where a claimant's subjective testimony is supported by
medical evidence that satisfies the standard, such testimony is
itself sufficient to support a finding of disability.  Brown, 921
F.2d at 1236; and Hale v. Bowen, 831 F.2d 1007, 1011 (11th Cir.
1987).  However, before subjective complaints and testimony can
be considered by the ALJ, the claimant must produce: 1) evidence
of an underlying medical condition; and either 2) objective
medical evidence confirming the severity of the alleged pain
arising from that condition or 3) that the objectively determined
medical condition is of such severity that it can reasonably be
expected to cause the alleged pain.  See, e.g., Wilson, 284 F.3d
at 1225; Gilmore v. Apfel, 2000 WL 284207, *3 (S.D. Ala. Feb. 23,
2000); Foote, 67 F.3d at 1560-1562.[12]

The ALJ may reject a claimant's complaints and subjective
testimony as not credible, but his decision to do so must be

---

[12]Reversal is required where the ALJ does not apply this pain
standard; however, a verbatim application is not necessary as he need
only make findings that indicate use of the proper standard.  Brown,
921 F.2d at 1236.  If the ALJ is found to have utilized the proper
standard, then the reviewing court determines whether substantial
evidence supports his finding under the standard.  Callahan, 125 F.3d
at 1439.

supported by substantial evidence and he must articulate adequate reasons for rejecting the testimony in his decision. <u>Brown</u>, 921 F.2d at 1236; <u>Hale</u>, 831 F.2d at 1011; <u>Foote</u>, 67 F.3d at 1561-1562. Failure to do so, requires, as a matter of law, that the claimant's testimony be accepted as true. <u>Id</u>. <u>See also Cannon v. Bowen</u>, 858 F.2d 1541, 1545 (11th Cir. 1988).[13] Notwithstanding, credibility determinations regarding witnesses remain the province of the ALJ; thus, a reviewing court is precluded from re-weighing the evidence anew. <u>Moore v. Barnhart</u>, 405 F.3d 1208, 1212 (11th Cir. 2005); <u>Miles v. Chater</u>, 84 F.3d 1397, 1400 (11th Cir. 1996);

---

[13]As noted in <u>Foote</u>, 67 F.3d at 1562:

A clearly articulated credibility finding with substantial supporting evidence in the record will not be disturbed by a reviewing court. *MacGregor v. Bowen*, 786 F.2d 1050, 1054 (11th Cir.1986). A lack of an explicit credibility finding becomes a ground for remand when credibility is critical to the outcome of the case. *Smallwood v. Schweiker,* 681 F.2d 1349, 1352 (11th Cir.1982). While an adequate credibility finding need not cite "particular phrases or formulations ... broad findings that [a claimant] lacked credibility and could return to her past work alone are not enough to enable us to conclude that [the ALJ] considered her medical condition as a whole." *Jamison v. Bowen,* 814 F.2d 585, 588-90 (11th Cir.1987). If proof of disability is based upon subjective evidence and a credibility determination is, therefore, critical to the decision, "the ALJ must either explicitly discredit such testimony or the implication must be so clear as to amount to a specific credibility finding." *Tieniber v. Heckler,* 720 F.2d 1251, 1255 (11th Cir.1983) (ALJ did not specifically address testimony by claimant and her daughter about claimant's pain). Explicit credibility findings are "necessary and crucial where subjective pain is an issue." *Walden v. Schweiker,* 672 F.2d 835, 839 (11th Cir. 1982) . . . .

Wilson v. Heckler, 734 F.2d 513, 517 (11th Cir. 1984) (per curiam); Kelly v. Heckler, 736 F.2d 631, 632 (11th Cir. 1984). As discussed herein, the ALJ properly applied the correct standard and provided legally adequate reasons for discounting Plaintiff's testimony regarding the severity of Joseph's impairments in the domains of interacting/relating with others and caring for oneself. In his decision, the ALJ concluded that even when "giving the claimant [Plaintiff] the full benefit of doubt," "[b]ased on the objective evidence of record," Joseph possessed less than marked limitations in all of the domains – including the two at issue. (Tr. 28). According to the ALJ:

> [t]he claimant's assertions relative to [Joseph's] symptomatology, functional limitations and restrictions of activities of daily living have been considered in light of the factors set forth in 20 CFR § 416.929 and SSR 96-7p, and are found to lack corroboration or substantiation in the medical evidence, and are not credible as to a disabling impairment.

(Id. at 37, Finding 9). In reaching this conclusion, the ALJ considered the record evidence, including Plaintiff's testimony, the Teacher Questionnaire, the ADHD Questionnaire, and the medical records. As detailed below, this evidence fails to demonstrate that Joseph has a marked limitation in any domain.

### 2. Interacting and Relating with Others

The record includes the findings of psychologist John W. Davis, Ph.D., (hereinafter "Dr. Davis"), who conducted a

16

consultative psychological exam of Joseph on March 11, 2002.
(Tr. 304-307).  Dr. Davis concluded that while testing put Joseph
in the borderline intellectual range of intelligence, he could
perform simple tasks and get along with others; thus, providing
support for the ALJ's finding that his alleged mental impairments
are not of disabling severity.[14] (Id. at 306-307).  Additionally,
Dr. Davis made the following observations regarding Joseph: 1)
"[h]is general appearance, dress, and behavior were consistent
with his age and the occasion[]" and "[t]here was nothing unusual
about his gait, posture, mannerisms, or hygiene[;]" 2) he has not
been involved in any legal situations; and 3) he has no

> unusual mannerisms, tics, or gestures. . . . [h]is
> speech was spontaneous . . . . [n]ormal communication
> was easily accomplished . . . . [h]is affective
> expression shows no difficulty in initiating,
> sustaining, or terminating emotional responses . . . .
> [which] are appropriate to the thought, content, and
> situation of the evaluation.  He is oriented in all
> spheres.  There is no indication that he has
> hallucinations, delusions, sees visions, hears voices,
> or has other circumstances of perceptual disturbance.
> There are no indications of feelings of detachment from
> his environment.
>
> His thought processes show normal productivity and
> continuity of thought.  There are no language
> impairments.  He is able to express himself freely.
> There is no indication of loose associations,
> incomprehensible speech, etc. He has no preoccupations,
> such as phobias, obsessions, ideas of reference,
> suicidal ideation, homicidal ideation or hypocondriacal

---

[14]Reeves v. Heckler, 734 F.2d 519, 552 n.1 (11th Cir. 1984)
(holding that the duty to develop the record includes ordering a
consultative exam if one is needed to make an informed decision).

symptoms. . . .
                              *  *  *
. . . . Rapport was established and maintained.  The
patient cooperated with the examiner, appearing friendly
as well as comfortable in the test setting. . . .
                              *  *  *
During the time that Joseph was in this office no
indication of any other disorders were seen.   No
indication specifically of ADHD, anxiety, or panic
attacks, etc.  These may be controlled by my medication.
                              *  *  *

(Id. at 304-307).

The record also contains a Teacher's Questionnaire dated

March 18, 2002 and completed by Ms. Amanda Dearman, (hereinafter

"Ms. Dearman"), Joseph's fourth grade teacher.  (Id. at 151-161).

In the Questionnaire, regarding the domain of interacting and

relating with others, Ms. Dearman concluded that Joseph has no

problems:  making and keeping friends; seeking attention

appropriately; asking permission appropriately; following rules

(classroom, games and sports); respecting/obeying adults in

authority; relating experiences and telling stories; using

language appropriate to the situation and listener; introducing

and maintaining relevant and appropriate topics of conversation;

taking turns in a conversation; interpreting meaning of facial

expression, body language, hints and sarcasm; and using adequate

vocabulary and grammar to express thoughts/ideas in general

everyday conversation.  (Id. at 156).  Ms. Dearman only noted a

slight problem on a monthly (rather than weekly, daily or hourly)

18

basis with Joseph playing cooperatively with children and expressing anger appropriately. (Id.) Additionally, Ms. Dearman concluded that she could understand almost all of Joseph's speech as a familiar listener on the first attempt, when the topic of conversation was both known and unknown. (Tr. 157). Ms. Dearman added that she could understand almost all of Joseph's speech after repetition and/or rephrasing. (Id.) Ms. Dearman opined that "Joe was a good student who tried really hard[,]" and noted that:

> Joe showed no signs of any major medical problems. He wanted to be a bully a [sic] times to the other children. I had to reason with Joe and explain the consequences of his behavior. He would be fine. Joe also wanted to have anxiety attacks where he wanted to go home. I found once I stood up to Joseph and let him know I was not going to let him have his way he calmed down and went back to work (This was a one time episode). I felt as long as Joe has a strong authority figure he will do fine in school.

(Id. at 160-161).

Ms. LaDonna Hovatter, (hereinafter "Ms. Hovatter"), Joseph's fifth grade teacher, also completed a Questionnaire on April 26, 2002. (Id. at 162-172). While Ms. Hovatter observed that Joseph had some problems interacting/relating with others, she also found that he had: 1) no problems playing cooperatively with other children, making and keeping friends, relating experiences and telling stories, and interpreting meanings of facial expression, body language, hints and sarcasm; and 2) only a slight problem

seeking attention appropriately, introducing/maintaining relevant and appropriate topics of conversation, and using adequate vocabulary/grammar to express thoughts/ideas in general everyday conversation. (Id. at 167). Ms. Hovatter stated that she could understand almost all of Joseph's speech as a familiar listener on the first attempt, when the topic of conversation was known, and ½-b of his speech when the topic of conversation was unknown. (Id. at 168). Likewise, Ms. Hovatter stated that she could understand almost all of Joseph's speech after repetition and/or rephrasing. (Tr. 168). Significantly, Ms. Hovatter concluded that even though Joseph suffers from asthma, anxiety/panic disorder and ADHD, "in collaborating with his other teachers, we agree that these conditions do not interfere with Joe's [Joseph's] ability to function[,]" adding that "[w]ith the prescribed medication and when taken appropriately, Joe could meet his academic requirements, if he would exhibit more effort." (Id. at 171). The record reveals that Ms. Hovatter also found that "[w]hether or not he [Joseph] does well [in school] depends a lot on how much effort the assignment/test requires . . . Joe does not study at home . . . if it's not obtained within the classroom, he won't and doesn't care to get it . . . ." (Id. at 172 (emphasis in original)).

On March 15, 2002, John W. Lowery, M.D., (hereinafter "Dr.

Lowery"), conducted a consultative examination of Joseph and noted that Plaintiff reported that he was not doing very well at school; however, he did play during P.E. (<u>Id</u>. at 308-309). Dr. Lowery's physical examination revealed no clubbing, cyanosis or edema. (<u>Id</u>.) Joseph had a full range of motion in all of his joints. (<u>Id</u>.) His peripheral pulses were 4/5, and his gait was normal. (Tr. 308-309). Dr. Lowery further observed that the neurological exam was normal, and that Joseph spoke and was easily understood. (<u>Id</u>.)

Treatment notes from Stephen Andrews, M.D., (hereinafter "Dr. Andrews"), who treated Joseph from July 2001 through March 2002, are also included in the record. (<u>Id</u>. at 314-323). The notes reflect that Dr. Andrews treated Joseph for a variety of ailments. (<u>Id</u>.) In January 2002, Joseph's mother reported that he was having joint pains, congestion, loose stool, and reflux problems. (<u>Id</u>. at 318). His physical examination was normal, except that mild to moderate tenderness to palpation along the left contavertebral angle (of the chest area) was observed. (<u>Id</u>.) His vitals were normal, and no swelling was observed. (Tr. 318). Dr. Andrews' assessment was joint pain, hypertriglyceridemia, URI, gastroenteritis, and GERD. (<u>Id</u>.) During Joseph's March 7, 2002 visit, his mother reported that Joseph was sent home for high blood pressure and because he appeared flushed. (<u>Id</u>. at 317).

21

She also reported that he was experiencing chest pains, and increased anxiety.  (Id.)  His physical examination was unremarkable, except that mild to moderate tenderness to palpation along the left contavertebral angle (of the chest area) was observed. (Id.)  Dr. Andrews' assessment was anxiety disorder and costachondritis.  (Id.)  Dr. Andrews increased Joseph's Prozac to 40 m.g. in the mornings, and continued him on Xanax and Arthrotec.  (Tr. 317).  The last recorded visit in the record reflects that during the March 21, 2002 visit, Joseph's mother reported that he was "doing quite well[,]" that he was "no longer having anxiety attacks[,]" and that he was "quite well adjusted." (Id. at 316).  His physical examination was unremarkable, except that some wheezing in the chest was noted.  (Id.)

Treatment notes from Jimmy Lawrence, M.D., (hereinafter "Dr. Lawrence"), of the Pediatric Rheumatology Clinic, are also included in the record.  (Id. at 331-335, 356).  The notes cover the period February 7, 2002 through November 26, 2002.  (Id.)  They reflect that Joseph presented with complaints of sleeping disorder, generalized pain, generalized anxiety, swelling and pain in his knee and his joints.  (Id. at 333).  The HENT exam was unremarkable and no swelling was observed in his knees nor ankles.  (Tr. 333-334).  Some tenderness was noted on the interior rotation of both hips.  (Id.)  Dr. Lawrence's impression was possible

22

juvenile ankylosing spondylitis, severe generalized anxiety disorder, juvenile fibromyalgia and attention deficit disorder. (Id. at 333). On a return visit in August 2002, Joseph presented with similar complaints. (Id. at 331). Dr. Lawrence noted that Joseph was not in school because of his severe anxiety, and directed that his Xanax be started again because it had helped him in the past. (Id.) He observed that Joseph's left knee was markedly improved, but he was still in some pain. (Id.) He also noted weight gain, and that the HENT exam was unremarkable. (Tr. 331). The treatment notes from Joseph's November 26, 2002 visit reflect that the Xanax "really helped" with Joseph's anxiety. (Id. at 356). Dr. Lawrence noted that Joseph is active, and that he went to the fair and rode alone. (Id.) He commented that Joseph is "doing things that he has not done[]" before. (Id.) The treatment notes also reflect that Joseph complained of joint pain and reported mild discomfort in his left ankle following trauma to his left leg. (Id.)

Also contained in the record is an Interdisciplinary Treatment Plan created for Joseph at MMHC, on June 17, 2002, (id. at 348), and an ADHD Questionnaire dated October 8, 2002, (Tr. 349), and signed by Leigh Anne Macon, (hereinafter "Ms. Macon"), a therapist at MMHC. Ms. Macon also signed off on the treatment plan along with Plaintiff, Joseph and Dr. Maury Diggs. (Id. at

348).   The treatment plan lists Joseph's strength as family support of his mother, leisure interests, sense of humor, motivated for treatment, and religious affiliation/support network.   (<u>Id</u>.)   Under the section designated liabilities/weakness, no problems were noted in the areas of hygiene, feeding, mobility, sight, hearing, speech, literacy, or dietary restrictions.  (<u>Id</u>.)  The only weakness noted, was that Joseph's natural father was being treated for depression and ADHD. (<u>Id</u>.)

On the ADHD Questionnaire, Ms. Macon indicated that she had treated Joseph approximately thirty times, but did not state the last time that she had actually met with him.  (<u>Id</u>. at 349).  She also noted that he was taking Zoloft, Remeron, Clonazepam, and Adderall.  (Tr. 349).  She opined that Joseph has marked inattention, marked impulsiveness and marked hyperactivity. (<u>Id</u>.) Additionally, she opined that Joseph has marked impairments in age-appropriate cognitive/communication function, age-appropriate social functioning, personal/behavioral function, and deficiencies of concentration, persistence and pace resulting in frequent failure to complete tasks in a timely manner.  (<u>Id</u>.)  She also rated Joseph's GAF at 55.  (<u>Id</u>.)

Based upon a review of the record, including that referenced above, the undersigned finds that substantial evidence supports

the ALJ's decision.  In finding that Joseph has a less than marked limitation in the domain of interacting and relating with others, the ALJ relied upon portions of Plaintiff's hearing testimony, and information contained in the November 2001 Functional Report, which was completed by Plaintiff. (Id. at 24-37).  Additionally, the ALJ discussed the reports of Plaintiff's fourth and fifth grade teachers, as well as the medical reports.  (Id.)  In reviewing this evidence, the ALJ correctly concluded that while Plaintiff testified that Joseph has problems at school with crying, vomiting and panic attacks, she also testified that the medications and therapy seemed to be helping, and that the medication has pretty much gotten his anxiety under control. (Tr. 28, 53).  She also expressed optimism that Joseph would be able to return to school the upcoming semester. (Id. at 28, 53-54).

Additionally, Dr. Davis' report demonstrates that Joseph's condition improved with medication. (Id. at 304-307).  Following a consultative examination of Joseph on March 11, 2002, Dr. Davis concluded that while the testing placed Joseph in the borderline intellectual range of intelligence, he could perform simple tasks and get along with others. (Id.)  Dr. Davis further noted that rapport was easily established with Joseph, and that he showed no signs of anxiety or ADHD. (Tr. 304-307).

Moreover, Ms. Dearman's March 18, 2002 Teacher's

Questionnaire likewise support the ALJ's decision. (<u>Id</u>. at 151-161).  As noted <u>supra</u>, Ms. Dearman concluded that Brown has no problems: making and keeping friends; seeking attention appropriately; asking permission appropriately; following rules; respecting/obeying adults in authority; relating experiences and telling stories; using language appropriate to the situation and listener; introducing and maintaining relevant and appropriate topics of conversation; taking turns in a conversation; interpreting meaning of facial expression, body language, hints and sarcasm; and using adequate vocabulary and grammar to express thoughts/ideas in general everyday conversation.  (Tr. 156). While Ms. Dearman noted a slight problem with Joseph playing cooperatively with children and expressing anger appropriately, she concluded that he is a good student who tries hard, and who will do fine in school as long he has a strong authority figure. (<u>Id</u>. at 156, 159).

Similarly, Ms. Hovatter's April 2002 Teacher's Questionnaire also reflects that Joseph had no problems playing cooperatively with other children, making and keeping friends, and relating experiences and telling stores.  (<u>Id</u>. at 162-172).  While Ms. Hovatter reported that Joseph had some problems interacting/relating with others and a slight problem seeking attention appropriately, introducing/maintaining relevant and

appropriate   topics   of   conversation   and   using   adequate
vocabulary/grammar to express thoughts/ideas in general everyday
conversation, she noted that after collaborating with his other
teachers, it was believed that Joseph's conditions (asthma,
anxiety/panic disorder and ADHD) did not interfere with his
ability to function, and that as long as he complied with his
prescribed medication, he could meet his academic requirements.
(Id. at 167, 171-172).

Further, Joseph's medical records support the ALJ's
conclusion that Joseph has less than marked limitations in the
domain of interacting and relating with others.   The records
reflect that Joseph's condition responded well to medical
treatment, and that no treating physician nor psychologist ever
concluded that his impairments are of disability severity.[15]   In
fact, in January 2002, Tara S. Mallett, D.O., (hereinafter "Dr.
Mallet"), of Community Medical Center, who had treated Joseph in
the past, declined to perform an examination of him in connection
with his claim for disability benefits because she did not believe
his hyperactivity was disabling.[16]   (Tr. 218).   Likewise, as

---

[15]Arnold v. Heckler, 732 F.2d 881, 884 (11th Cir. 1984)(holding
that it is significant that no physician found claimant disabled
under the Act.)

[16]This Court also notes that Dr. Michael S. Huber, Dr. Mallett's
associate, had already noted as early as May 25, 2000, that Joseph's
"depression and asthma are stable on current treatments." (Tr. 219-
230).

27

stated <u>supra</u>, Dr. Andrews' treatment notes for March 2002 reflect that Joseph was "doing quite well," that he was "no longer having anxiety attacks" and was "quite well adjusted." (<u>Id</u>. at 316). Similarly, Dr. Lawrence also noted that Joseph's Xanax medication "really helped" his severe anxiety disorder, that he was now active, and that he was doing things he had never done before like riding alone on rides at the fair. (<u>Id</u>. at 356). It is also noteworthy that Disability Determination Services medical consultants, (hereinafter "DDS"), reviewed Joseph's medical records in May 2002, and concluded that he had a "less than marked" limitation in this domain.[17] (<u>Id</u>. at 324-330).

Although Plaintiff argues that Ms. Macon's October 8, 2002 ADHD Questionnaire supports her hearing testimony, the undersigned finds that the ALJ was correct in according little weight to Ms. Macon's opinions. The Questionnaire was prepared in October 2002, although it appears that her opinions were based on Joseph's June 2002 visit to MMHC. Moreover, the opinions expressed in the

---

[17]<u>Edwards v. Sullivan</u>, 937 F.2d 580, 584-585 (11th Cir. 1991) (holding that an ALJ may properly rely upon the opinions of a non-examining physicians which is consistent with the opinion of the examining physicians); <u>Perales</u>, 403 U.S. at 408 (concluding that use of a non-examining medical expert is proper). <u>See also</u> 20 C.F.R. § 416.927(f)(2) and SSR 96-6p. Here, while DDS concluded that "[p]arent statement is partially credible[] as "[h]e does have some limitations that are shown on this RFC[,]" the only limitation noted for this particular domain was a "less than marked" limitation, and Plaintiff has not disputed any other domain other than caring for oneself for which no limitations were found. (Tr. 329).

Questionnaire are not supported by any underlying treatment records, and are in stark contrast to all of the other evidence, including Plaintiff's own hearing testimony to the effect that Joseph's anxiety and panic attacks were controlled with medication and that all were hopeful that he would be ready to return to school in January 2003.   Because Ms. Macon's conclusions are unsupported by the evidence of record, the ALJ properly accorded them no significance.   Edwards v. Sullivan, 937 F.2d 580, 583-583 (11th Cir. 1991) (holding that even a treating physician's report may be discounted when it is not accompanied by supporting objective medical evidence or is wholly conclusory).

Finally, Joseph's school records provide further support for the ALJ's decision regarding this domain.   As the ALJ noted, even though Joseph had to repeat the first grade and was placed in special education classes for a learning disability, his grades are usually above average.   (Tr. 20-37, 117).   School psychologist Frank H. Roberts, Ph.D. (hereinafter "Dr. Roberts"), of the Greene County School District, an acceptable medical source,[18] conducted a psycho-educational test on Joseph and stated that his scores placed him in the range of average intelligence, providing support for the ALJ's finding that his alleged mental impairments, while

---

[18] 20 C.F.R. § 416.913(a)(2) (stating that information from other, non-medical sources may also be considered when assessing a claimant's medical condition).

severe, are not of disabling severity. (<u>Id</u>. at 233-238). 20
C.F.R. § 416.913(a)(2) (stating that information from other, non-
medical sources may also be considered in assessing a claimant's
medical condition). A February 2001 "Summary Report" of Joseph's
level of performance in the fourth grade (at age 11) also
indicated that while he had "some" difficulties with his attention
span and excessive hyperactive activity, his behavior
"difficulties" were reduced dramatically when he was moved to a
special education classroom. (<u>Id</u>. at 130-131). During the 2001-
2002 school year, when Joseph was entering the fifth grade, an
Individualized Education Program form was completed (<u>id</u>. at 132-
150) which indicated that he worked in mathematics at the grade
level, his weakness was reading, and that he "functions well in
a regular classroom." (<u>Id</u>. at 132). Also, Leakesville School
District records for this same time period indicate that upon
repeating the first grade, Joseph received mostly A's and B's
through the fourth grade. (<u>Id</u>. at 116-119). In sum, this Court's
review of all of the evidence of record reveals that the ALJ's
decision, regarding both Plaintiff's credibility and the domain
of interacting and relating with others, was based upon
substantial evidence.

**3.   <u>Caring For Oneself</u>**

Substantial evidence also supports the ALJ's finding that

Joseph has a less than marked limitation in the domain of caring for oneself.  For this domain, the ALJ considered "[]how well the child [Joseph] maintains a healthy emotional and physical state, including how well the child [Joseph] meets physical and emotional wants and needs in appropriate ways, copes with stress and changes in his environment, and takes care of his own health, possessions and living area[,]" and concluded that he has a less than marked limitation in this domain.  (Tr. at 26, 33).  20 C.F.R. § 416.926a(k).[19]  As correctly determined by the ALJ, Plaintiff's statement and reports regarding Joseph support a finding that he can take care of himself.  (Id.)  As noted previously, Plaintiff testified that the medication had pretty much gotten Joseph's anxiety under control.  (Id. at 53).  Additionally, in a November 16, 2001 Functional Report, Plaintiff reported that she was "not sure" if Joseph's impairments affected his ability to help himself or cooperate with others in taking care of personal needs.  (Id. at 33, 91).

The ALJ also properly found that Plaintiff's assertion that Joseph "did not pick up and put away toys, did not hang up his clothes, did not help around the house or do what he was told most of the time, and he did not obey safety rules[]" was of no import,

---

[19]Section 416.926a also lists examples of limited functioning in this domain.

because "[e]ven children without impairments may at times display such behavior." (Id. at 33).  It is noteworthy that Plaintiff reported that Joseph uses zippers by himself, buttons clothes by himself, ties shoelaces, takes a bath or shower without help, brushes his teeth, combs or brushes his hair, washes his hair by himself, chooses clothes by himself, eats by himself using a knife, fork and spoon, gets to school on time, and accepts criticisms or correction.  (Id. at 91).

Moreover, in Ms. Dearman's March 18, 2002 Teacher's Questionnaire, she reported that Joseph had only a *few* problems with this domain and that they occurred only on a monthly basis – not on a weekly, daily or hourly basis.  (Tr. 159).  That being said, it is significant that Ms. Dearman simultaneously concluded that Joseph had no problems being patient when necessary; taking care of his personal hygiene; caring for his physical needs (dressing, eating, etc.); cooperating in, or being responsible for, taking needed medications; using good judgment regarding personal safety and dangerous circumstances; identifying and appropriately asserting emotional needs; and knowing when to ask for help.  (Id.)  Ms. Dearman concluded that he "can do fine in any setting once he realizes there is a higher authority that refuses to back down." (Id.)

Similarly, while Ms. Hovatter indicated in her April 26, 2002

32

Teacher's Questionnaire that Joseph displays a great deal of "nonchalance in his attitude toward[s] assignments, responsibilities, rules and consequences, and school in general[,]"[20] she concluded that for the vast majority of activities related to this domain, Joseph has no problems. (Id. at 163, 170). Ms. Hovatter found that Joseph has no problems taking care of his personal hygiene; caring for his physical needs (e.g., dressing, eating); cooperating in, or being responsible for, taking needed medications; using good judgment regarding personal safety and dangerous circumstances; identifying and appropriately asserting emotional needs; using appropriate coping skills to meet daily demands of school environment; and knowing when to ask for help. (Id. at 170). Indeed, as noted supra, even though Ms. Hovatter stated that Joseph is "easily frustrated and quick to anger," and suffers from asthma, anxiety/panic disorder and ADHD, she concluded: "in collaborating with his other teachers, we agree that these conditions [Joseph's impairments] do not interfere with Joe's ability to function[]" and "[w]ith the prescribed medication and when taken appropriately, Joe could meet

---

[20]Indeed, Ms. Hovatter emphasized the lack of effort, rather than an impairment, as Joseph's problem, because "[w]hether or not he [Joseph] does well [in school] depends a lot on how much effort the assignment/test requires . . . Joe does not study at home . . . if it's not obtained within the classroom, he won't and doesn't care to get it . . . ." (Tr. 172).

his academic requirements, if he would exhibit more effort." (Tr. 170-171).

Further, in May 2002, DDS concluded that even though Joseph was quick to anger and impatient, he had no limitations in this domain.[21]  (Id. at 327).

Finally, Ms. Macon's October 8, 2002 ADHD Questionnaire, which reflects that Joseph has a marked limitation in this domain was not entitled to any weight because it does not specifically address the key factors for this domain (i.e., how well he maintains a healthy emotional and physical state, how well he gets his physical and emotional wants and needs met in appropriate ways, how he copes with stress and changes in his environment and whether he takes care of his own health, possessions, and living area).  (Id. at 349).   Ms. Macon's conclusions are also not supported by any treatment notes and are in stark contrast to the other evidence of record.   Thus, the ALJ properly accorded Ms. Macon's conclusions no significance.   Edwards, 937 F.2d at 583-

---

[21]Edwards, 937 F.2d at 584-585 (holding that an ALJ may properly rely upon the opinions of a non-examining physicians which is consistent with the opinion of the examining physicians); and Perales, 403 U.S. at 408 (concluding that use of a non-examining medical expert is proper). See also 20 C.F.R. § 416.927(f)(2) and SSR 96-6p. Here, while DDS concluded that "[p]arent statement is partially credible[] as "[h]e does have some limitations that are shown on this RFC[,]" there were no limitations noted for this particular domain and Plaintiff has not disputed any other domain other than interacting and relating with others. (Tr. 329).

583.  This Court's review of all of the evidence of record reveals that the ALJ's findings with respect to the domain of caring for oneself was based upon substantial evidence.

**V.**   **Conclusion**

The undersigned finds that substantial evidence supports the ALJ's finding that Joseph does not have a marked limitation in the two domains of interacting and relating with others and caring for onself.  The ALJ set forth adequate reasons for the credibility and weight afforded Plaintiff's testimony and clearly set forth record evidence upon which his decision was based.  For the reasons set forth herein, and upon careful consideration of the administrative record and memoranda of the parties, it is the recommendation of the undersigned that the decision of the Commissioner of Social Security denying Plaintiff's claim for supplemental security income benefits for her son, Joseph, be **AFFIRMED.**

The attached sheet contains important information regarding objections to this <u>report and recommendation</u>.

DONE this **29th** day of **September, 2005**.

> _____ /s/SONJA F. BIVINS _____
> **UNITED STATES MAGISTRATE JUDGE**

35

**MAGISTRATE JUDGE'S EXPLANATION OF PROCEDURAL RIGHTS
AND RESPONSIBILITIES FOLLOWING RECOMMENDATION
<u>AND FINDINGS CONCERNING NEED FOR TRANSCRIPT</u>**

1.   <u>**Objection**</u>.  Any party who objects to this recommendation or anything in it must, within ten days of the date of service of this document, file specific written objections with the clerk of court.  Failure to do so will bar a <u>de</u> <u>novo</u> determination by the district judge of anything in the recommendation and will bar an attack, on appeal, of the factual findings of the magistrate judge.  <u>See</u> 28 U.S.C. § 636(b)(1)(c); and <u>Lewis v. Smith</u>, 855 F.2d 736, 738 (11th Cir. 1988).  The procedure for challenging the findings and recommendations of the magistrate judge is set out in more detail in SD ALA LR 72.4 (June 1, 1997), which provides, in part, that:

> A party may object to a recommendation entered by a magistrate judge in a dispositive matter, that is, a matter excepted by 28 U.S.C. § 636(b)(1)(A), by filing a "Statement of Objection to Magistrate Judge's Recommendation" within ten days after being served with a copy of the recommendation, unless a different time is established by order.  The statement of objection shall specify those portions of the recommendation to which objection is made and the basis for the objection.  The objecting party shall submit to the district judge, at the time of filing the objection, a brief setting forth the party's arguments that the magistrate judge's recommendation should be reviewed *de novo* and a different disposition made.  It is insufficient to submit only a copy of the original brief submitted to the magistrate judge, although a copy of the original brief may be submitted or referred to and incorporated into the brief in support of the objection.  Failure to submit a brief in support of the objection may be deemed an abandonment of the objection.

A magistrate judge's recommendation cannot be appealed to a Court of Appeals; only the district judge's order or judgment can be appealed.

2.   <u>**Opposing party's response to the objection**</u>.  Any opposing party may submit a brief opposing the objection within ten (10) days of being served with a copy of the statement of objection.

36

<u>See</u> Fed. R. Civ. P. 72; SD ALA LR 72.4(b).

3.  **<u>Transcript (applicable where proceedings tape recorded)</u>**.
Pursuant to 28 U.S.C. § 1915 and Fed.R.Civ.P. 72(b), the
magistrate judge finds that the tapes and original records in
this action are adequate for purposes of review.  Any party
planning to object to this recommendation, but unable to pay the
fee for a transcript, is advised that a judicial determination
that transcription is necessary is required before the United
States will pay the cost of the transcript.

<u>      /s/ SONJA F. BIVINS      </u>
**UNITED STATES MAGISTRATE JUDGE**